OPINION.
{¶ 1} Defendant-Appellant, Terrence J. Flynn, appeals the judgment of the Tiffin Municipal Court denying his motion to suppress evidence of marijuana obtained pursuant to a police impoundment and inventory of his vehicle. On appeal, Flynn asserts that the trial court erred in overruling his motion to suppress. Finding that Flynn's vehicle was inventoried according to a standardized police procedure, we affirm.
 {¶ 2} In January of 2006, Flynn was arrested for driving under suspension and for possession of less than 100 grams of marijuana. Flynn did not contest the driving under suspension charge and initially pled not guilty to the drug possession charge. Flynn also moved to suppress the evidence of marijuana. In February of 2006, the trial court held a hearing on Flynn's motion to suppress. Subsequently, the trial court denied the motion to suppress.
 {¶ 3} During the hearing on Flynn's motion to suppress, the lone witness, Officer Shawn Vallery, testified that the following events occurred. On January 8, 2006, Officer Vallery spotted Flynn driving a Jeep Cherokee during a routine patrol. He conducted a check on Flynn's plates and learned that his license was suspended. Officer Vallery obtained Flynn's address and proceeded to Flynn's home. As Officer Vallery approached, he saw Flynn park his vehicle on the street in front of his home. As Flynn exited his vehicle, Officer Vallery approached him, questioned him about the suspension, and obtained his identification. Officer Vallery stated that he then ran the information and verified that Flynn was under a Financial Responsibility Act (FRA) suspension. Officer Vallery arrested Flynn and called for a tow truck.
 {¶ 4} Officer Vallery continued that, shortly thereafter, another policeman, Officer O'Connor, arrived at Flynn's home. The officers inventoried Flynn's vehicle, and recorded the items found on the Tiffin Police Department's standard inventory sheet. Officer Vallery testified that, during the course of the inventory, he discovered a marijuana cigarette in the console ashtray of Flynn's vehicle and seized it as evidence. After completing the inventory, Officer Vallery removed groceries and work uniforms from the vehicle and placed them inside Flynn's residence at Flynn's request. Officer Vallery stated that he then left the scene in order to transport Flynn to the police station. Officer O'Connor stayed with the vehicle until the tow truck arrived.
 {¶ 5} Officer Vallery stated that Flynn's vehicle had to be impounded and inventoried pursuant to the Tiffin Police Department's standard policy regarding Financial Responsibility Act (FRA) suspensions. He stated that when an arrest is made under these circumstances, "due to being under a non-compliance or an FRA suspension we're required by the State to tow the vehicle and impound it in the impound lot." (Hearing Tr. p. 11). He further explained that under the Department's impoundment procedure, policemen are to do the following:
 If it's under an FRA suspension, non-compliance or a DUI we're to impound the vehicle at Rosenblatt's, [the city impound lot]. We contact 1st Avenue because they're the tow company that handles that. [We] do the vehicle inventory, uhm, to let out (Sic.) and then the vehicle is released, uhm, to the towing company.
(Hearing Tr. p. 11). Officer Vallery testified that he complied with this procedure.
 {¶ 6} On cross-examination, Officer Vallery admitted that he did not have a warrant for Flynn's arrest, for the search of Flynn's vehicle, or for the seizure of the contraband. Officer Vallery also stated that the police department's policy for impounding and inventorying vehicles was located in a handbook issued by the police department. When asked what the handbook specifically said about impoundment, towing, and inventory, Officer Vallery replied:
 It states that certain offenses that vehicles must be impounded and towed for, and them (Sic) vehicles will be inventoried which we have a sheet that we fill out so that when it's towed, if there's items that the subject states that are missing from the vehicle we have an inventory to show what we inventoried out of it.
(Hearing Tr. p. 15). Officer Vallery admitted that he did not know what the policy stated "word for word", and that he no longer possessed a copy of the handbook because the Department collected all of the handbooks and uploaded their contents onto the Department computer system. (Hearing Tr. p. 15). Neither party presented a copy of the Department policy at the hearing.
 {¶ 7} Officer Vallery also explained that he did not think he requested assistance from Officer O'Connor. He stated that, instead, when other officers "listen to the radio traffic and hear that [a driver is] under suspension they're gonna know that there's a vehicle inventory so they will assist." (Hearing Tr. p. 14).
 {¶ 8} Officer Vallery further stated that the police usually inventory at the scene rather than the impound lot:
 Usually inventorying a vehicle at the scene the subject is present there. So, if there's any items that he would particularly want out of the vehicle or items he wants to make sure that are inventoried are taken out he is present to view that or ask questions about that.
(Hearing Tr. p. 22). Officer Vallery then described the inventory procedure:
 Officer Vallery: I would retrieve a tow — tow vehicle inventory sheet and start filling out the pertinent information; whose vehicle it is, what type of vehicle it is, uhm, why it was being towed. And, then, there's a small section that can be filled out so when you start going through the vehicle you can start writing things down.
 Flynn's Counsel: And where did you obtain this sheet?
 Officer Vallery: I carry that with me. I have several forms that I carry with me in a police bag that I carry with me.
 Flynn's Counsel: So, you got the sheet, then, what did you do?
 Officer Vallery: Officer O'Connor was there. He stated — either I asked him or he stated he wrote down the items while I inventoried the vehicle or called off items that were in the vehicle. I think I also made contact with Mr. Flynn or he was calling me about the items he wanted out of the vehicle.
 Flynn's Counsel: Well, where did you start first? Officer Vallery: On the driver's side.
 Flynn's Counsel: Doing what? Officer Vallery: Inventorying the vehicle.
 Flynn's Counsel: On the driver's side what was there to inventory?
 Officer Vallery: Well, we look — we look under the seats to see if there's any items that might be under there, that may have slid under there, items on the floor, items on the seat, uhm, in the glove compartment. People keep items in their ashtrays, check that. And, then, once you completely check that area then you go to the next, which is the back compartment. And, then, there's, obviously another compartment due to it being a SUV, you check them items, (Sic) sort through items and write'em down.
 Flynn's Counsel: Does that sound to you like you're looking for something that's illegal?
 Officer Vallery: Does it sound like it? No, because stuff does go under the seats that might be valuable. People keep change — I know I keep change in my — in my ashtray. People keeps (Sic) item in silly places. So, no. It's an inventory. An inventory wouldn't be complete if you didn't check the complete vehicle area.
 Flynn's Counsel: Well, how do you know what to list on the sheet?
 Officer Vallery: Well, obviously, items of great value, yes, like CD players, any type of money, if there's magazines — if there's multiple magazines or if there's CD's we try to count the CD's out and write down CD's. Uhm, you know, if there's junk or trash, you know, you put miscellaneous items so you try to inventory everything possible.
 Flynn's Counsel: And once you've inventoried or listed, then, what do you do with the items?
 Officer Vallery: They stay in the vehicle unless they request — sometimes if there's a cell phone or an item that I believe is of great value, I may ask them if they want that item out of their vehicle and somebody to pick it up.
(Hearing Tr. pp. 23-25).
 {¶ 9} Officer Vallery admitted that he had no reason to suspect that Flynn was subject to an arrest warrant; that the vehicle was stolen; that the vehicle contained weapons; that the vehicle contained contraband prior to the arrest and inventory; and, that Flynn did not have a suspicious appearance.
 {¶ 10} At the close of the hearing, the trial court denied Flynn's motion to suppress. Specifically, the trial court found that the arrest of Flynn for driving under FRA suspension was valid; that an inventory search is "designed to protect the interest of the individual of the vehicle that is being seized"; that the Tiffin Police Department had a valid inventory policy in place; and, that Officer Vallery strictly followed the inventory policy. (Hearing Tr. pp. 34-36).
 {¶ 11} Thereafter, Flynn changed his plea from not guilty to no contest. The trial court found him guilty of possession of marijuana under R.C. 2925.11, a minor misdemeanor. Flynn was sentenced to pay a fifty-dollar fine plus court costs and received a six-month suspension of his driver's license with occupational driving allowed.
 {¶ 12} Flynn appeals the judgment of the trial court denying his motion to suppress, presenting the following assignment of error for our review.
 THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS.
 {¶ 13} In his sole assignment of error, Flynn contends that the trial court erred in overruling his motion to suppress the evidence of marijuana. Specifically, Flynn asserts that Officer Vallery violated the Fourth Amendment by conducting a warrantless inventory search because the Tiffin Police Department had no written, articulated, specific practice or policy governing motor vehicle inventories.
 {¶ 14} Upon reviewing a trial court's ruling on a motion to suppress, an appellate court must accept the trial court's findings of facts so long as they are supported by competent, credible evidence. State v.Roberts, 110 Ohio St.3d 71, 2006-Ohio-3665 at ¶ 100, citing State v.Fanning (1982) 1 Ohio St.3d 19, 20. The appellate court must then review the application of the law to the facts de novo. Roberts, supra, citingState v. Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372 at
 {¶ 15} At a suppression hearing, the State bears the burden of establishing that a warrantless search and seizure falls within one of the exceptions to the warrant requirement, Xenia v. Wallace (1988),37 Ohio St.3d 216, para. two of syllabus; State v. Kessler (1978),53 Ohio St.2d 204, 207, and that it meets Fourth Amendment standards of reasonableness. Maumee v. Weisner, 87 Ohio St. 3d 295, 297, 1999-Ohio-68
citing 5 LaFave, Search and Seizure (3 Ed. 1996), Section 11.2(b). In the case of vehicle inventories, the United States Supreme Court recognized that such searches are a "well-defined exception to the warrant requirement of the Fourth Amendment." Colorado v. Bertine
(1987), 479 U.S. 367, 371; see, also, South Dakota v. Opperman (1976),428 U.S. 364; State v. Mesa, 87 Ohio St.3d 105, 1999-Ohio-253 at 108-109, citing Bertine and Opperman, supra. Such searches are administrative in nature and "intended to (1) protect an individual's property while it is in police custody, (2) protect police against claims of lost, stolen or vandalized property, and (3) protect police from dangerous instrumentalities." Mesa, 87 Ohio St.3d at 109, citingOpperman, 428 U.S. at 369.
 {¶ 16} However, the U.S. Supreme Court emphasized that warrantless inventory searches of automobiles are permissible only where the automobile has been legally impounded. State v. Collura (1991),72 Ohio App.3d 364, 370, citing Opperman, supra. Once a court determines whether the impoundment was lawful, it must then determine whether the warrantless inventory search was permissible. State v. Taylor (1996),114 Ohio App.3d 416, 422.
 {¶ 17} The Ohio Supreme Court has interpreted Opperman to require that, to be reasonable, a valid warrantless inventory search must be performed "pursuant to a standard practice and not merely as a pretext for an evidentiary search." State v. Cole (1994), 93 Ohio App.3d 712,715, citing State v. Robinson (1979), 58 Ohio St.2d 478, 480. Such a standard practice or policy need not be in writing so long as it is regulated by "standardized criteria or an established routine."State v. McCulloch (1992), 3d Dist. No. 8-91-25, 1992 WL 209297, citingIllinois v. Lafayette (1983), 462 U.S. 640. However, a policeman's "bare conclusory assertion that an inventory search was done pursuant to police department policy is not sufficient, standing alone, to meet the state's burden of proving that a warrantless search was reasonable * * *. Rather, the evidence presented must demonstrate that the police department has a standardized, routine policy, demonstrate what that policy is, and show how the officer's conduct conformed to that standardized policy." State v. Bozeman, 2d Dist. No. 19155,2002 WL 1041847, 2002-Ohio-2588.
 {¶ 18} In the case sub judice, Flynn submitted in his motion to suppress that the impoundment of his vehicle was lawful under the Ohio Revised Code, and neither party addressed the lawfulness of the impoundment at the suppression hearing. On appeal, Flynn only disputes the trial court's finding that the inventory was conducted pursuant to a standardized policy or routine.[1] Therefore, we will focus solely on the validity of the inventory search.[2]
 {¶ 19} Flynn argues that the inventory was a pretext for an illegal investigatory search because the State did not present a written, articulated, standardized, specific police policy or practice governing the conduct of inventory searches at the suppression hearing.
 {¶ 20} Flynn's assertion that the State was required to introduce a written police policy is misplaced. In McCulloch, this Court clearly established that the existence of a written policy is not required as long as the inventory procedure is regulated by standardized criteria or an established routine. Thus, the relevant inquiry is whether the evidence indicated that a standardized policy or procedure existed, and whether Officer Vallery followed that policy. Bozeman, 2002-Ohio-2588.
 {¶ 21} Officer Vallery's testimony, the sole evidence introduced at the suppression hearing, indicates that a policy or routine exists within the Tiffin Police Department; that it is standardized; and, that Officer Vallery followed it with respect to Flynn. First, in terms of the existence of a policy or practice, Officer Vallery testified that a policy was formerly set forth in the Tiffin Police Department handbook, which is now maintained on the Department's computer system. Furthermore, the inventory sheets, which request information about the vehicle, the vehicle's owner, the reason for impoundment, and the items retrieved, suggest a policy or practice is in place. Moreover, Officer O'Connor's appearance at the scene to assist with the inventory, when Officer Vallery did not request him to do so, supports the conclusion that a policy exists.
 {¶ 22} Next, Officer Vallery's testimony also indicates that the policy is standardized. He testified that the policy lists the specific offenses for which impoundment and inventory was required; that it specified a particular towing company to be utilized; and, that it required that the same inventory sheets be filled in for any impoundment and inventory. Officer O'Connor's appearance also supports the conclusion that the policy is standardized because, as Officer Vallery speculated, Officer O'Connor knew that impoundment was required given the offense was a FRA suspension, and responded accordingly to assist. Additionally, Officer Vallery's description of how the inventory itself is conducted, what items are to be listed, and the disposition of the items illustrates that the procedure is standardized.
 {¶ 23} Finally, Officer Vallery's testimony demonstrates that he complied with the policy. Upon verifying that Flynn was driving under a FRA suspension, he called the towing company. After Officer O'Connor arrived, Officer Vallery called off the items for Officer O'Connor to record on the inventory sheet. Officer Vallery recounted the steps he took during the inventory, beginning with the search of the driver's seat area. He also removed the items that Flynn requested — his groceries and work uniforms — and placed them inside Flynn's residence. Officer Vallery's testimony that Flynn did not appear suspicious to him and that he had no reason to suspect that weapons or contraband might be in the vehicle demonstrates that Officer Vallery conducted the inventory according to standardized police policy, not in bad faith or as a pretext to investigate. See, e.g., McCulloch, 1992 WL 209297 (affirming denial of motion to suppress evidence of drugs because standardized inventory procedure existed and State Trooper complied with it where Trooper testified that standard policy was in place; that she followed the procedure in her process and method during the inventory; that she had no reason to suspect appellant had drugs in vehicle; and described the inventory policy). Therefore, we find that the trial court's determination that a Tiffin Police Department policy governing impoundment and inventory existed, that it was standardized, and that Officer Vallery complied with it in this situation was supported by competent, credible evidence. Since the warrantless search and seizure was legal, the trial court did not err in denying Flynn's motion to suppress.
 {¶ 24} Accordingly, Flynn's assignment of error is overruled.
 {¶ 25} Having found no error prejudicial to the Appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed.
 SHAW and CUPP, JJ., concur.
[1] We note that although Officer Vallery testified that the State requires impoundment of the vehicle, and the prosecution asserted in its appellate brief that a thirty day immobilization and impoundment by police is required by statute, we find no such authority. To the contrary, the statute referenced by the prosecution specifically requires the court — not the police — to order immobilization of the vehicle and impoundment of the license plates, and only afterconviction of the registered owner for driving under a FRA suspension. R.C. 4510.16(B)(1)-(2)(a).
[2] See State v. Peagler, 76 Ohio St.3d 496, 499, 1996-Ohio-73
("Generally, an appellate court will not consider any error that counsel could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.") [Citations omitted].